# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.   22-mj-402 |
| THE GOOGLE E-MAIL ADDRESS KEVINSMITH689@GMAIL.COM | ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____Eastern_____ District of _____Pennsylvania_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s 1951 | Sex trafficking by force; Sex trafficking of a minor |

The application is based on these facts:

See attached affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ Special Agent Glenn Booth
*Applicant's  signature*

Special Agent Glenn Booth
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    3/21/2022 (3:54 p.m.)

_____
/s/ The Honorable Timothy R. Rice
*Judge's signature*

City and state: Philadelphia, PA

The Honorable Timothy R. Rice
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>THE GOOGLE E-MAIL ADDRESS<br>KEVINSMITH689@GMAIL.COM | )<br>)<br>)  Case No.   22-mj-402<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____Pennsylvania_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the duty magistrate.

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:      _____03/21/2022 3:54 pm_____          _____/s/ The Honorable Timothy R. Rice_____
                                                                                                              *Judge's signature*

City and state:      _____Philadelphia, PA_____          _____The Honorable Timothy R. Rice_____
                                                                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    22-mj-402 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

  I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

                      _____
                          *Executing officer's signature*

                      _____
                          *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE GOOGLE E-MAIL ADDRESS KEVINSMITH689@GMAIL.COM | Case No. 22-mj-402<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH WARRANT**

I, Glenn G. Booth, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.       On August 25, 2021, the Honorable Richard A. Lloret authorized a warrant to search a Google e-mail ("g-mail") account address used by a sex trafficker Kevin Smith: kevinsmith**5**89@gmail.com.    However, I have since discovered that the search warrant (and related materials) for the Google e-mail account address contained a type-over: the correct address is kevinsmith**6**89@gmail.com (the "**Target Account**").   Accordingly, I am now resubmitting a second affidavit and application for a warrant to search the **Target Account** based on the same probable cause as before.

2.       Although it has been several months since the previous warrant, the requested warrant applies to the same historical timeframe (July 31, 2015 – October 1, 2019) for which there is probable cause to believe a search will reveal evidence of a crime.    Additionally, although SMITH has been charged already and is currently being prosecuted for his sex trafficking crimes, law enforcement continue to investigate further crimes in an effort to identify other victims of his sex trafficking enterprise.

3.       The warrant would authorize the search of the **Target Account** for the information described in the following paragraphs and in Attachment A and would require Google LLC (herein

the "Provider") to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachments B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## AGENT BACKGROUND

4.      I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been employed as a Special Agent of the FBI for over twenty-three years, and am currently assigned to the Philadelphia Division, Fort Washington Resident Agency, where I investigate various matters including Violent Crimes Against Children.  During my career, I have worked cases involving but not limited to Sex Trafficking, Child Sex Trafficking and Child Pornography.  I have also worked dozens of cases involving the use of the internet and social media to perpetrate crimes such as Violent Crimes Against Children and Child Sex Trafficking.  I have gained experience through my participation in these cases and through training at the FBI Academy, numerous conferences, and online training courses.  I have also presented case studies regarding Child Sex Trafficking at regional and national conferences.

5.      In my training and experience, criminals who manage sex trafficking enterprises frequently use violence, intimidation, and physical force to run their affairs.  These sex traffickers sometimes use force to protect their victims from threats posed by customers, but also often use violence to force women or girls to remain working for them conducting commercial sex.  I am also aware, from my training and experience, that sex traffickers frequently manipulate and abuse—both physically and emotionally—women in order to force them to engage in prostitution, and exploit women sexually and financially for themselves.  Relatedly, sex traffickers frequently target vulnerable women, including drug addicts, juveniles, and other distressed or troubled

females, to entice them to engage in commercial sex on their behalf.  I am also aware that sex traffickers often provide women with controlled substances in order to foster their attachment (via addiction) to the sex trafficker as well as the sex trafficking enterprise.

6.     Based on my training and experience working sex trafficking cases, I am aware that criminals who profit from the sex trafficking of women and children in violation of federal law frequently use digital user accounts, including e-mail address accounts, social media accounts, and Internet websites, to further their activities.  For example, sex traffickers frequently use Internet websites to advertise the sexual services of their victims.  These websites include Craig's List, Backpage.com,[1] Escort Fish, MegaPersonals, and other sites that allow classified or anonymous advertisements of this nature.  I am also aware, from my training and experience, that users must set up accounts to post such advertisements that are linked to an electronic mail account ("e-mail address").

7.     Accordingly, a search of e-mail accounts used to post online sex advertisements can discover valuable evidence of sex trafficking, including information about (i) the site and internet address used to advertise sexual services; (ii) the identity of the individual or entity who posted the advertisement; (iii) the identity and background of the victim; (iv) the content, including any message, images, captions, or other attachments, of the advertisement; (v) any responses, messages, or other communications from individuals who respond to the advertisement and solicit the sexual services; (vi) metadata, transactional data, and background information regarding the date, time, and content of the advertisement; (vii) the method and means of communication used by sex traffickers for subsequent contacts and arrangements between customers and sex trafficked workers; and (viii) other relevant evidence of illegal sex trafficking.

---

[1] This website is now defunct.

8.      Similarly, I am also aware that the invention of "smart phones" (e.g. Apple iPhones and Samsung Galaxy) has also developed the means by which sex traffickers can conduct criminal activity.  Through the use of mobile "smart" phones, sex traffickers can now directly access the Internet from their phone and conduct sex trafficking activity therefrom by (i) posting online advertisements of their victims; (ii) communicating with their victims, sex buyers, and coconspirators through all sorts of mobile communication applications, including social media; (iii) taking pictures and videos of sex trafficking victims to advertise their services; (iv) accessing their e-mail accounts to coordinate and conduct sex trafficking business; (v) accessing other internet websites in furtherance of sex trafficking activity; (vi) and other uses.  Accordingly, a search of smart phones, as well as their remote digital back-ups maintained by the phone manufacturer (i.e. an Apple I-Cloud account) can reveal valuable evidence of these criminal activities.

9.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

## PROBABLE CAUSE

10.     The Federal Bureau of Investigation as well as state and local law enforcement have been investigating Kevin SMITH (DOB: 07/14/1994) for several years for a sex trafficking enterprise he has conducted from on or around July 31, 2015 to October 1, 2019 using actual or threatened physical force and violence, and which has involved minors.  As detailed below, there is probable cause that SMITH has violated Title 18, United States Code, Section 1591 (sex trafficking of minors and sex trafficking by force), and that a search of the **Target Account** will

reveal evidence of those crimes.  As described below, both confidential witnesses and law enforcement officers relate that SMITH has run an illegal sex trafficking enterprise that has involved violence and underage girls.

***Law Enforcement Arrests and Interviews (2015-2018)***

11.     On September 4, 2015, Bensalem Police Department officers responded to a call for a violent domestic disturbance at the Quality Inn Hotel at 3671 Street Road, Bensalem, Pennsylvania to find a Confidential Witness ("CW1") visibly beaten with "several ligature marks around her neck" and "bruises on her left arm."  When interviewed, CW1 told officers she prostituted for her "pimp" SMITH for the past two-and-a-half months during which SMITH would post online advertisements (including on Backpage.com) for interested sex buyers to have sex with CW1 for money.  CW1 related that SMITH would retain all proceeds from the commercial sex acts (up to $1,000 a day) and effectively forced her to work for free save for taking care of her expenses.  In fact, CW1 stated that SMITH physically assaulted her because on this occasion CW1 protested the work conditions and attempted to keep the money for her own.   Enraged, SMITH grabbed CW1 by the throat and choked her to the point of losing consciousness.   He then threw her across the room and slammed her head on a mattress, causing her glasses to break and lacerating her beneath her left eye.  After the incident, SMITH seized the proceeds of CW1's sex acts that night ($800) and left.  CW1 provided a signed statement back at the police station and photographs were taken of her injuries.

12.     On November 9, 2016, undercover officers with the Bensalem Police Department responded to an advertisement for sexual services by a minor CW4 (DOB: 07/xx/1999) at the Radisson Hotel, and found CW4 in a hotel room (430) rented out by and registered in the name of CW1.  Investigators subsequently found CW1 in another room (649) in the hotel she had rented.

CW4 did not cooperate with law enforcement regarding the underlying sex trafficking scheme, but did admit to engaging in prostitution in the past. She was arrested for prostitution.

13.     A week later, investigators once more interviewed CW4. On this occasion, November 14, 2016, investigators tried to have CW4 identify her "pimp," but CW4 claimed that she was working on her own. Both federal and state law enforcement believe CW4 was attempting to protect SMITH from criminal liability. Nevertheless, when pressed, CW4 did admit that SMITH was engaged in illegal sex trafficking, and—most notably—admitted that she had worked for SMITH years ago underage (she was even still a minor at the time of this interview). She further stated that she had prostituted at numerous hotels in Bensalem Township and Bristol Township during this time with both CW1 and SMITH. Investigators requested to search CW4's phone, at which point she stated that they would find text messages to SMITH involving giving him money, and that CW1 had given her the phone. While she denied working for SMITH and CW1 during this time, based on my investigation and these admissions by CW4, I believe that CW4 was performing sex work for SMITH's sex trafficking enterprise during this period.

14.     On June 26, 2017, Philadelphia Police Department officers responded to a report of a violent assault at or around 6144 Pine Street, Philadelphia, Pennsylvania. Upon arrival, officers observed visible injuries (bruise under eye, scratch marks/bruises on neck) on CW1, who reported that SMITH had struck her in the face multiple times with a closed fist and choked her.

15.     A few days later, on June 30, 2017, Tinicum Township Police Department officers responded to another call for a violent assault committed by SMITH on CW1 at the Wyndham Gardens Hotel, Room 452, at 45 Industrial Highway, Essington, Pennsylvania. When officers arrived, medical personnel were already treating CW1 for her injuries—including visible facial injuries as well as body trauma. Officers interviewed CW1, who reported that SMITH forcibly

entered her hotel room and immediately attacked her with punches to the face and kicks to her body. SMITH proceeded to choke CW1 until she was unconscious, and then fled when an eyewitness saw the violent assault and called police.

16. In the aftermath of law enforcement responding to the scene, and during their interview of CW1, SMITH called CW1 on her cell phone repeatedly. CW1 answered her phone at one point, and one of the police officers overheard a male (believed to be SMITH) stating that he did not kick her in the face, and only punched her in the face.

**Witness Statements**

17. CW1 has been interviewed by law enforcement several times[2] in relation to SMITH's sex trafficking enterprise. To my knowledge, CW1 has not cooperated in the hopes of leniency on pending charges. She has, however, at times minimized her own role and that of SMITH in the sex trafficking business, including in an interview on January 21, 2017 where she omitted much of the illegal acts committed by SMITH that are discussed in this affidavit. However, she would later state in her July 25, 2017 interview that she was afraid that SMITH would direct violence against her if she cooperated against him.

18. To summarize the content of these interviews, CW1 functioned as the "bottom" (i.e. a trusted subordinate/deputy who would assume some tasks of running the sex trafficking enterprise) for SMITH during an extensive period of his sex trafficking, and she related that SMITH conducted a sex trafficking ring from the time she met him (July 31, 2015) until her last

---

[2] These interviews occurred as follows: (i) September 4, 2015 by the Bensalem Police Department in response to a 9-1-1 call for a violent assault; (ii) June 3, 2016 by the Bensalem Police Department in response to a call for a domestic disturbance; (iii) June 30, 2017, in the Taylor Hospital, 175 East Chester Pike, Ridley Park, Pennsylvania, by the Federal Bureau of Investigation after SMITH violently assaulted her; (iv) July 25, 2017 by the Federal Bureau of Investigation once CW1 was released from the hospital in the aftermath of the June 30, 2017 assault.

contact with him in or around the summer of 2017. She stated that SMITH would manage the prostitution of several (five or sex) girls at a time during this period, including underage girls such as CW4 and another minor named "Diamond" (real name unknown), and specifically recalled CW4 working for SMITH in Buck's County, Pennsylvania, in the fall of 2016. This information has been corroborated during the arrest of CW1 and CW4 on November 9, 2016, and the post-arrest interviews of CW4 that occurred afterward. CW1 claims she did not know CW4 was underage until this incident, but recollected that SMITH met CW4 on Instagram.

19. CW1 also identified "Diamond" (Name Unknown), "Shay" (Name Unknown), CW2, another underage girl named "Diamond" (Name Unknown), and other girls who worked for SMITH during this time. CW1 stated that SMITH frequently used violence to coerce women to remain in his employ and effectively work for free (he would pay expenses). CW1 recalls one incident in the spring of 2017 where SMITH punched "Diamond" in the face and broke her nose during an argument over the arrangement. CW1 specifically estimates that SMITH beat her more than fifty times, and she would "get the shit beaten out of her" anytime she questioned SMITH's relationship with other girls or the financial arrangement of the business. CW1 also recalled one incident where she did not give SMITH the money earned from prostituting: SMITH drove to pick her up under the pretense of taking her out to eat, and then beat her and left her on the side of the road. CW1 recalled another incident in or around November or December 2016, when she tried to leave him at 30th Street Station in Philadelphia, Pennsylvania. SMITH pursued her with an associate ("Jay") and physically dragged her to his car before putting a firearm to her stomach and pulling the trigger. According to CW1, the gun jammed.

20. Confidential Witness 2 ("CW2") also prostituted for SMITH and was interviewed on October 4, 2017, and October 11, 2017. CW2 claims she knew SMITH for many years and

was aware that he had a sex trafficking ring during that time period, which included a minor girl ("Mxxxx") who was approximately fifteen years old at the time.  CW2 relates, however, she only began to work for SMITH in early 2017 in Wilmington, Delaware.  CW2 corroborated that either SMITH, herself, or another girl would post advertisements online for her sexual services, and then set up "dates" with interested sex buyers.  CW2 also stated that SMITH demanded **all** of the money she earned from prostitution, and that SMITH would only pay her expenses, although on occasion he would provide her with marijuana or Percocet pills.

21.    CW2 corroborated that SMITH violently forced women to engage in sex trafficking.[3]  She recalls one occasion, on a date she cannot remember precisely, in which SMITH slapped her in a hotel room because CW2 complained about the arrangement of her working for him for free, and therefore wanted to leave him.  She stated that SMITH slapped her on multiple occasions while she prostituted for him.  While on one occasions she did state that she did not "necessarily" stay with SMITH because she was afraid, on other occasions she did admit she was afraid of him, that he would not let her leave, and that he often carried firearms.  CW2 also observed SMITH physically assault CW1 on multiple occasions during this period (circa early 2017 to October 2017), and that CW1 warned CW2 that SMITH was dangerous and had in fact killed people.

22.    Confidential Witness 3 (CW3) also was prostituted by SMITH, and was interviewed on January 8, 2018 and October 5, 2018.  She confirmed SMITH managed a sex trafficking enterprise in the greater Philadelphia area from 2017 to 2018 in which he would retain all revenue earned by the women, and would only provide their basic expenses for the job such as

---

[3] I have since learned that CW2 passed away on March 29, 2021 in a drug overdose unrelated to this case.

food and clothing. CW3 corroborated that CW1 and CW2 were prostituted by SMITH, and CW1 functioned as the "bottom" (previously defined) girl. CW3 claimed that SMITH managed several girls during this period (including CW1 and CW2), and that either himself or CW1 would book the hotel rooms for CW3 and other women to engage in commercial sex.

23.    CW3 also detailed that SMITH would violently assault women, and recalls the aforementioned incidents in which SMITH physically assaulted both CW1 and CW2. SMITH also physically beat CW3 (breaking her nose) inside of a vehicle, she claimed, after he learned that she was talking to another male on the phone. On another occasion while SMITH was running his sex trafficking enterprise in Delaware, he beat CW3, threw her down a flight of stairs, and then threw a firearm at her. CW3 also recalled that all women who worked for SMITH had to get tattoos of his name on their body (a claim CW1 made as well), and investigators have observed and photographed some of these tattoos. CW3 stated that, in general terms, that she felt that she could never leave SMITH out of fear of violent retaliation.

24.    As noted above, CW4 (a minor) provided some limited information regarding SMITH during interviews on November 9, 2016 and November 14, 2016, although these statements did indicate, as I explain above, that she was being prostituted by SMITH during this period. While CW4 has discussed working for other sex traffickers besides SMITH in other interviews (conducted on January 3, 2016 and May 31, 2016), she has declined other attempts by law enforcement to ask her about SMITH's sex trafficking activities. However, in another interview in August 27, 2018 conducted by the FBI, CW4 claimed that SMITH approached her recently to solicit her to prostitute for him. The timing of this solicitation is not clear, and CW4 had recently turned 18 years old at the time of the interview.

*Interview of Kevin Smith (January 25, 2017)*

25.     On January 21, 2017, the FBI interviewed SMITH under the pretense of wanting information regarding another sex trafficker named Derrick HEPPARD.  SMITH agreed to the interview, during which he admitted to managing CW1 in a sex trafficking enterprise, but claimed it was consensual and equitable.  While he denies ever managing minor CW4, he confessed that he put CW4 in touch with CW1 for the purposes of reentering the sex trafficking business with her.

### The Sex Trafficking of Minor Confidential Witness 5

26.     In late September 2019, SMITH forced a runaway minor, Confidential Witness 5 ("CW5") (DOB: 08/xx/2004), to prostitute for him for several days from roughly September 24, 2017 until September 27, 2017.  After her rescue by law enforcement, investigators interviewed CW5 on October 16, 2017.

27.     According to CW5 and other witness statements, she ran away from home (in Media, Pennsylvania) on September 21, 2019, and her parents reported her missing that same day. The following day, CW5 and another juvenile friend boarded a train station to Philadelphia, where they later encountered the cousin of SMITH (Confidential Witness 6 – "CW6").  According to both CW5 and CW6, CW6 let CW5 stay at a friend's house for one night before he handed her off to SMITH on the understanding that CW5 could stay with him indefinitely.

28.     On or around September 23, 2019, CW6 and SMITH met in a parking lot, at which point CW5 was passed over to SMITH's care.  SMITH then drove CW5 to 385 Harrison Street, Apartment B3, Upper Darby, Pennsylvania, where he forced CW5 to undress, put on undergarments  SMITH provided, and pose for pictures.  When CW5 questioned SMITH about this, SMITH stated that if she did not do what he said he would confiscate the clothes he loaned her and essentially put her out on the street naked and with no money or phone.

29.     Repeating this same threat, SMITH then raped CW5 on the couch in the apartment. In addition to the threat of leaving her naked, penniless, and abandoned in an unknown location, CW5 thought SMITH was very "scary" and had a threatening demeanor and tone.  CW5 claimed that she told SMITH to "stop" during the sex, but he refused.

30.     According to CW5, SMITH then forced CW5 to have sex with men for money in the days that followed—from approximately September 23, 2019 until September 26, 2019. SMITH, according to CW5 and as corroborated by electronic evidence, posted CW5's pictures on the internet sites "MegaPersonals" and "Escort Fish," and then—with the assistance of a coconspirator ("CC1") who also worked for SMITH—facilitated dates with men who responded to these advertisements to have sex for money.  As with the other women SMITH employed, CW5 received no money and was ordered to surrender anything she earned to SMITH.  CW5 stated that SMITH drove her to many of the commercial sex encounters, although another coconspirator sometimes facilitated the encounters as well.

31.      CW5 does not recall how many times or for how long she was forced to perform sex for SMITH.   She claims that she did so out of fear and that she did not try to escape due to a hope that if she did what SMITH said, he would eventually let her go.   On or around September 28, 2019, CC1 allowed CW5 to flee from her vehicle upon learning of SMITH's arrest.

32.     Towards the end of her time working for SMITH, on or around September 27, 2019, one of the sex buyers (Confidential Witness 7 ("CW7")) who responded to an advertisement for CW7 and who ultimately purchased sex from her, observed a media bulletin notifying the public of CW5's disappearance.  CW7 promptly notified law enforcement, and was later interviewed on October 22, 2019 as well as May 13, 2021, by law enforcement.  CW7 confirmed transacting with CW5 for sex, although he claimed he did not know she was a minor.  CW7 stated that he came

forward not out of fear of criminal liability, but rather due to a genuine concern for CW5's safety. CW7 also stated that CW5 was accompanied by another female, believed to be CC1, who seemed to be in charge.

33.     Law enforcement officers recovered a cell phone from SMITH after his arrest, and obtained warrants to search its contents.   When law enforcement obtained a warrant to search SMITH's cell phone,[4] the evidence recovered showed that the e-mail account associated with SMITH and his phone was the **Target Account**.

34.     In addition, SMITH's phone also contained the advertisements posted for the sexual services of CW5 on MegaPersonals.com, which further confirms that SMITH used this phone to conduct his sex trafficking of CW5.   This phone also contained searches for CW5's name ("***** *******"), as well as reviewing articles concerning her disappearance.

## THE TARGET ACCOUNTS

35.     As summarized above, there is probable cause to believe that SMITH has committed violations of Title 18, United States Code, Section 1591 (sex trafficking of minors and sex trafficking by force).  I further submit that there is probable cause that SMITH has used the **Target Account** and that a search of the **Target Account** will reveal evidence of a crime.[5]

36.     CW1 has identified SMITH as the user of the **Target Account**, which has been corroborated by the search of SMITH's cell phone which also lists the **Target Account** as one of his e-mail addresses.  On July 13, 2017, in compliance with a Federal Grand Jury Subpoena,

---

[4] Investigators also determined SMITH was the user of this phone by searching the phone of his coconspirator (CC1) and noting that his phone number was named "Kev."

[5] A federal grand jury returned an indictment against Kevin SMITH on July 29, 2021.  *See United States v. Smith*, 21-288-GEKP.  However, neither this charge nor his previous arrest affects the probable cause that a search of the **Target Accounts** will reveal evidence of a crime, nor does it in affect the authority for the Court to issue a search warrant for an investigation that is still ongoing.

Backpage.com provided numerous advertisements and supporting invoices related to the email address kevinsmith689@gmail.com (i.e. **Target Account**).  The advertisements reveal photos of girls posing both in lingerie and nude.  They also include photos of CW1, CW2, and CW3.  Additionally, there are photos of SMITH in a prostitution advertisement posted by a subscriber utilizing **Target Account**.

**Author** zahh_sturdyyy (Instagram: 4834214599)
**Sent** 2019-03-01 12:28:43 UTC
**Body** Whts ya email

**Author** khajirdad (Instagram: 1546322451)
**Sent** 2019-03-01 16:13:10 UTC
**Body** Kevinsmith689@gmail.com

[Screenshot of March 1, 2019 Instagram direct message]



[Screenshot of text message from SMITH's phone].

38.      Based on my general training and experience regarding the use of e-mail accounts to further sex trafficking activity, the subpoena returns from the websites previously mentioned, and in light of the statements by witnesses that SMITH regularly used Internet websites (linked with his e-mail account) to conduct sex trafficking, I submit that SMITH uses **Target Account** and a search of this account will reveal evidence of a crime.

### THE "G-MAIL" WARRANT (Target Account, Attachments A-B)

39.      In my training and experience, I have learned that Google, LLC provides a variety of on-line services, including electronic mail ("email") access, to the public.  Google allows subscribers to obtain email accounts at the domain name "gmail.com," like the email accounts listed in Attachment C.  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction

information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

40.    A Google subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.   In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

41.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

42.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage

of the account.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

43.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

44.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed

or used.  For example, as described below, email providers typically log the Internet Protocol
(IP) addresses from which users access the email account, along with the time and date of that
access.  By determining the physical location associated with the logged IP addresses,
investigators can understand the chronological and geographic context of the email account
access and use relating to the crime under investigation. This geographic and timeline
information may tend to either inculpate or exculpate the account owner.  Additionally,
information stored at the user's account may further indicate the geographic location of the
account user at a particular time (*e.g.*, location information integrated into an image or video sent
via email).  Last, stored electronic data may provide relevant insight into the email account
owner's state of mind as it relates to the offense under investigation. For example, information in
the email account may indicate the owner's motive and intent to commit a crime (*e.g.*,
communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications
in an effort to conceal them from law enforcement).

## **CONCLUSION**

45.     Based on the forgoing, I request that the Court issue the proposed search warrants.

46.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not
required for the service or execution of this warrant.  The government will execute this warrant
by serving the warrant on Google.  Because the warrant will be served on these providers, who
will then compile the requested records at a time convenient to it, reasonable cause exists to
permit the execution of the requested warrant at any time in the day or night.

47.     I further request that the Court direct Google to disclose to the government any
information described in Section I of Attachment B that is within its possession, custody, or
control.

Respectfully Submitted,


/s/ *Glenn Booth*_____
Special Agent Glenn Booth
Federal Bureau of Investigation

Subscribed and sworn to before me on March 21, 2022, 3:54 p.m.

/s/ The Honorable Timothy R. Rice
HONORABLE TIMOTHY R. RICE
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A (Google "g-mail" Account)</u>

### Property to Be Searched

This warrant applies to information associated with:

- **Target Account**: The Google e-mail ("g-mail") account address "kevinsmith689@gmail.com," believed to be used by Kevin SMITH (Attachments C-D);

that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company

headquartered at 1600 Amphitheatre Parkway, Mountain View, California.

## ATTACHMENT B (Google "g-mail" accounts)

### Particular Things to be Seized

**I.      Information to be disclosed by Google LLC**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all emails associated with the account from July 31, 2015 until October 1, 2019, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

e.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken. The Provider is hereby ordered to disclose the above information to the government within **fourteen days** of issuance of this warrant.

**II.     Information to be Seized**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18 of the United States Code 1591 those violations involving Kevin Smith and occurring between July 31, 2015 and October 1, 2019, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Any and all acts of sex trafficking by force or involving minors, including online advertisements for sexual services of trafficking victims, communications between Kevin Smith and customers, victims, and coconspirators, images and videos of sex trafficking victims and the relevant sex trafficking enterprise, and financial transactions and other electronic records relevant to the sex trafficking enterprise;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.